**ON REHEARING EN BANC**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

**FOR THE FOURTH CIRCUIT**

MELISSA JENNINGS,
*Plaintiff-Appellant,*

and

DEBBIE KELLER,
*Plaintiff,*

v.

UNIVERSITY OF NORTH CAROLINA, at Chapel Hill; ANSON DORRANCE, individually and as women's soccer coach at UNC; WILLIAM PALLADINO, individually and as assistant women's soccer coach at UNC; CHRIS DUCAR, individually and as assistant women's soccer coach at UNC; BILL PRENTICE, individually and as athletic trainer at UNC; MICHAEL K. HOOKER, individually and as Chancellor at UNC; SUSAN EHRINGHAUS, individually and as assistant to the Chancellor at UNC; RICHARD A. BADDOUR, individually and as Director of Athletics for UNC; BETH MILLER, individually and as Senior Associate Director of Athletics at UNC; JOHN SWOFFORD, individually and as former Director of Athletics for UNC; ALL DEFENDANTS,
*Defendants-Appellees.*

No. 04-2447

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-99-400-1)

Argued: October 25, 2006

Decided: April 9, 2007

Before WILKINS, Chief Judge, and NIEMEYER, WILLIAMS,
MICHAEL, MOTZ, TRAXLER, KING, GREGORY, SHEDD, and
DUNCAN, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Michael wrote the opinion, in which Chief Judge Wilkins,
Judge Motz, Judge Traxler, Judge King, Judge Gregory, Judge Shedd,
and Judge Duncan joined. Judge Gregory wrote a separate concurring
opinion, in which Judge Motz joined. Judge Niemeyer wrote a dis-
senting opinion, in which Judge Williams joined.

---

Judge Widener and Judge Wilkinson, being disqualified, did not par-
ticipate in this case.

---

## COUNSEL

**ARGUED:** Daniel Francis Konicek, KONICEK & DILLON, P.C.,
Geneva, Illinois, for Appellant. Thomas J. Ziko, NORTH CARO-
LINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellees. **ON BRIEF:** Jeffrey T. Mitchell, KONICEK & DILLON,
P.C., Geneva, Illinois, for Appellant. Joyce S. Rutledge, Assistant
Attorney General, NORTH CAROLINA DEPARTMENT OF JUS-
TICE, Raleigh, North Carolina, for Appellees; Douglas E. Kingsbery,
THARRINGTON SMITH, L.L.P., Raleigh, North Carolina, for
Appellee Anson Dorrance, individually and as women's soccer coach
at UNC.

**OPINION**

MICHAEL, Circuit Judge:

Melissa Jennings, a former student and soccer player at the University of North Carolina at Chapel Hill (UNC or the University), claims that her coach, Anson Dorrance, persistently and openly pried into and discussed the sex lives of his players and made sexually charged comments, thereby creating a hostile environment in the women's soccer program. Jennings sued UNC, Dorrance, Susan Ehringhaus (Assistant to the Chancellor and legal counsel to UNC), and several other individuals associated with the University, alleging violations of Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681 *et seq.*), 42 U.S.C. § 1983, and the common law. The district court awarded summary judgment to the defendants. After considering Jennings's appeal en banc, we vacate the summary judgment on her Title IX claim, her § 1983 claim against Dorrance for sexual harassment, and her § 1983 claim against Ehringhaus for sexual harassment based on supervisory liability. The summary judgment on the remaining claims and minor procedural rulings are affirmed.

I.

Because Jennings was the non-movant in the summary judgment proceedings, we recite the facts, with reasonable inferences drawn, in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). UNC has the country's most successful women's soccer program at the college level. The UNC team, with Dorrance as head coach, has won the most national championships in the history of the sport. In light of this record, young women soccer players with exceptional talent covet the opportunity to play on Dorrance's team. Dorrance personally recruited Jennings while she was in high school, and she joined the UNC team at the start of her freshman year in August 1996. Jennings was one of four goalkeepers until Dorrance cut her from the team in May 1998, at the end of her sophomore year. Jennings was seventeen when she started playing for Dorrance, and he was forty-five.

Once Jennings became a member of the UNC team, she was distressed to learn that Dorrance engaged in sexually charged talk in

team settings. Dorrance bombarded players with crude questions and comments about their sexual activities and made comments about players' bodies that portrayed them as sexual objects. In addition, Dorrance expressed (once within earshot of Jennings) his sexual fantasies about certain players, and he made, in plain view, inappropriate advances to another. This behavior on Dorrance's part occurred on a regular basis, particularly during team warm-up time at the beginning of practice. The sex-focused talk that Dorrance initiated or encouraged occurred at other times as well, or, as one player put it, "anytime the team was together," whether "on a plane, in a car, or on a bus, in a hotel, at practice, out of town, at events." J.A. 1066. Dorrance subjected Jennings or her teammates to sexually charged inquiries and comments in the following particulars.

In front of the entire team, Dorrance asked one player nearly every day "who [her] fuck of the minute is, fuck of the hour is, fuck of the week [is]," whether there was a "guy [she] ha[dn't] fucked yet," or whether she "got the guys' names as they came to the door or . . . just took a number." J.A. 1237-38, 1261-62. He asked a second player if she was "going to have sex with the entire lacrosse team," and advised a third, "[Y]ou just have to keep your knees together . . . you can't make it so easy for them." J.A. 1127. Dorrance frequently focused on a fourth player's sex life with questions such as whether she was going to have a "shag fest" when her boyfriend visited and whether she was "going to fuck him and leave him." J.A. 1238, 1248. The coach "direct[ed] inquir[ies]" to a fifth player about the size of her boyfriend's genitalia. J.A. 1452.

During practice Dorrance regularly commented on certain players' bodies, referring to their "nice legs," "nice rack[s]," breasts "bouncing," "asses in spandex," and "top heav[iness]." J.A. 393, 1073, 1229, 1236. Dorrance also called a player "Chuck" (her name was Charlotte) because he believed that she was a lesbian. J.A. 1228. He inquired pointedly in her presence about her sexual orientation, asking "[D]oes she not like the guys?" J.A. 1283.

Dorrance disclosed his sexual fantasies about several players. He told one player, Debbie Keller, that he would "die to be a fly on the wall" the first time her roommate, another team member, had sex. J.A. 1068. Dorrance admitted to Keller the reason for his fascination

about how her roommate might react during sex: he believed the young woman "was a very sexual person by nature," yet she was a virgin who was "fighting her inner self" because she was "so religious" (a born-again Christian). J.A. 1070. Another incident in this category occurred during a water break at practice, when Jennings overheard Dorrance tell a trainer that he fantasized about having "an Asian threesome" (group sex) with his Asian players. J.A. 1284-85.

Dorrance did not limit himself to inappropriate speech. He showed overt affection — affection of the sort that was not welcomed — for one player, Keller, in front of the entire team. He paid inordinate attention to Keller, frequently brushing her forehead, hugging her, rubbing her back, whispering in her ear, dangling a hand in front of her chest, or touching her stomach. Dorrance took other undue liberties with respect to Keller. For example, during one weight-lifting session when the players were lightly clad, Dorrance called Keller over to him and walked her outside "towards the stadium, putting his arms around her." J.A. 1432. Also, one evening Dorrance telephoned for Keller at home, and one of her roommates (not a soccer player) told him that Keller was out with her boyfriend. Dorrance retorted, "What is she doing, out having sex all over Franklin Street?" J.A. 1073. Dorrance told Keller that he "couldn't hide his affection for [her]" and said that "in a lifetime you should be as intimate with as many people as you can." J.A. 1011.

Jennings listened as Dorrance focused on the sex life of one player after another.[1] Jennings sought desperately to avoid Dorrance's ques-

---

[1]Jennings herself heard most of the comments recounted above that Dorrance made in front of the team. *See* J.A. 1229, 1236-38, 1248, 1261-62, 1283. The statements that Dorrance asked a particular player whether she was "going to have sex with the entire lacrosse team," J.A. 1127, and that he advised another player "to keep [her] knees together," *id.*, come from Debbie Keller's deposition, as the dissent notes, *see post* at 30 n.1. Nevertheless, Jennings's account of what was occurring is virtually the same. *See e.g.*, J.A. 1238 (Jennings testifying that Dorrance asked a player, "How many guys in the [lacrosse] team did [you] fuck?"). Amy Steelman, who played with Jennings, reported hearing, in a team setting, Dorrance's question to a player about the size of her boyfriend's genitalia. Jennings did not testify about that incident, but it is nevertheless

tions and ridicule about her personal life. She therefore tried to "stay out of [his] radar" by not participating in the discussions. J.A. 1242. She was targeted nevertheless. During a fall tournament in California at the end of Jennings's freshman season, Dorrance held one-on-one meetings with players in his hotel room to assess their performance for the season. Dorrance told Jennings that she was in danger of losing her eligibility to play soccer if her grades did not improve. In the midst of this discussion, Dorrance asked Jennings, "Who are you fucking?" J.A. 1330. She replied that it was "[n]one of his God damn business" what she did off field. J.A. 1325. As Jennings described the scene, "I was 17 when he asked me that in a dark hotel room, knee-to-knee, bed not made, sitting at one of those tiny tables." J.A. 1230. She felt acutely uncomfortable.

Jennings again found herself the target of Dorrance's sexual inquiries in a warm-up session during her sophomore year. Some of the players and Dorrance were discussing one player's weekend, called a "shag fest" by Dorrance, which ended with a young man crawling out of her window. Attention turned to Jennings, who had spent the same weekend with her boyfriend at another school. One player asked, using Jennings's nickname, "[W]ell, what about Trim'n?", J.A. 1246, and Dorrance immediately "chimed in," saying "[Y]es, what about Trim'n?" J.A. 1252. The coach wanted to know whether Jennings had "the same good weekend" as the player whose weekend he had just described as a shag fest. J.A. 1248. Dorrance thus encouraged the interrogation about personal sexual activity to "slide over" to Jennings for several minutes. J.A. 1249, 1254-55. She felt humiliated and refused to respond.

---

indicative of Dorrance's pattern of asking abusive questions to a number of different players. With respect to Keller, Jennings heard her say that "she was uncomfortable and didn't like the touching, the affection — the over-affection she was receiving" from Dorrance. J.A. 1291. Jennings witnessed some of Dorrance's displays of affection toward Keller, observing him "putting his arms around her." J.A. 1432-33. Finally, although Dorrance made the "fly on the wall" comment to Keller before Jennings joined the team, Jennings learned about it because players were still discussing it after she arrived. J.A. 1237.

Jennings felt "uncomfortable, filthy and humiliated" by Dorrance's persistent focus on sex and the sexual activities of his players. J.A. 1242. Dorrance's questions and comments moved from girl to girl to girl, putting Jennings in constant fear that she would be his target at some point, as she was. Jennings could not escape the anxiety that she felt and witnessed in others. She saw two players who were specifically targeted by Dorrance react with tears and facial expressions that portrayed feelings of disgust or unhappiness. The player Dorrance called "Chuck" was offended by his open focus on her sexual orientation. J.A. 1282-83. Amy Steelman, a player who was not specifically targeted, was "very uncomfortable with [the] sexually charged environment" that Dorrance had "created and encouraged." J.A. 1452. The environment "was so damaging that it affected [Steelman's] emotional well-being, and [she] would frequently come home crying" from practice. *Id.* Keller's intense discomfort at Dorrance's constant touching and affection was plainly evident from her body language and facial expression. Keller confirmed that Dorrance's touching and caressing "made [her] skin crawl" and made her "fe[el] dirty." J.A. 1145.

During the fall of her freshman year Jennings notified UNC about the hostile sexual environment that Dorrance had created within the women's soccer program. She lodged a complaint in a meeting with Susan Ehringhaus, legal counsel to the University and Assistant to the Chancellor. Jennings "gave [Ehringhaus] a [complete] run-down" about Dorrance's persistence in talking about players' sex lives when the team was assembled for practice or other activities. J.A. 1343. She reported her feelings of humiliation and discomfort. Ehringhaus dismissed these concerns and suggested that Jennings simply "work it out" with Dorrance. J.A. 1341. Jennings's complaint thus remained unaddressed by the UNC administration.

Jennings stayed on the team until she was cut by Dorrance during exams at the end of her sophomore year. He cited inadequate fitness as the reason. Over the next several days, Jennings's parents submitted several complaints to the Chancellor's office about Dorrance's regular involvement in discussions about the sexual activities of his players. Thereafter, the Director of Athletics, Richard Baddour, conducted an administrative review pursuant to UNC's sexual harassment policy. Dorrance admitted that he participated in group discussions

with players about their sex lives, but claimed that his comments were only "of a jesting or teasing nature." J.A. 1531. The review ended with Athletic Director Baddour sending a letter of apology to Jennings's father and a brief, mild letter of reprimand to Dorrance. Baddour wrote to Mr. Jennings on June 9, 1998, apologizing for Dorrance's "inappropriate . . . involvement in [sexual] discussions" with his team members. J.A. 1531. Dorrance indicated his own apology by counter-signing the letter. One day later, Baddour wrote to Dorrance declaring it "inappropriate for [Dorrance] to have conversations with members of [the] team (individually or in any size group) regarding their sexual activity." J.A. 1533.

In August 1998, at the start of Jennings's junior year, she and Keller brought this action against UNC and several individuals associated with the University, including Dorrance and Ehringhaus, asserting (among others) claims under Title IX and § 1983. After the lawsuit was filed, Jennings was threatened and harassed to the extent that UNC officials warned her that they could not guarantee her safety on campus. At UNC's urging, she spent her senior year at another school and was then awarded a UNC degree. Keller settled her claims and took a dismissal with prejudice. Jennings's case proceeded to the entry of summary judgment in favor of the defendants. She appealed and a divided panel of this court affirmed the judgment. *Jennings v. Univ. of N.C., at Chapel Hill*, 444 F.3d 255 (4th Cir. 2006). We vacated the panel decision and reheard the case en banc. Our review of the district court's grant of summary judgment is de novo. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (en banc).

## II.

Jennings claims that UNC discriminated against her in violation of Title IX by allowing Dorrance, the women's soccer coach, to subject her to severe and pervasive sexual harassment in the women's soccer program. Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Discrimination under Title IX includes coach-on-student sexual harassment that creates a hostile environment in a school sports pro-

gram. *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 (1992) (stating that teacher's sexual harassment of student is covered by Title IX). A private right of action against the institution is implied under Title IX, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979), and money damages are available as a remedy, *Franklin*, 503 U.S. at 76.

To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution. *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002). We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX. *See, e.g.*, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651 (1999); *Franklin*, 503 U.S. at 75.

A.

Jennings can establish the first element of her Title IX claim without dispute: she was a student at UNC, an institution receiving federal funds. On the second element of her claim, Jennings must proffer facts showing that Dorrance subjected her to harassment (verbal in this case) based on her sex. *See* 20 U.S.C. § 1681(a). Sexual harassment occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331-32 (4th Cir. 2003). A coach's sexually charged comments in a team setting, even if not directed specifically to the plaintiff, are relevant to determining whether the plaintiff was subjected to sex-based harassment. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (considering, in Title VII case, hostile comments concerning African Americans in general as well as similar comments directed specifically toward plaintiff).

UNC argues that Dorrance's sex-focused comments were "of a joking and teasing nature" that did not amount to sexual harassment. Appellees' Br. at 22; *see Faragher v. City of Boca Raton*, 524 U.S.

775, 788 (1998) (noting that "simple teasing [and] offhand comments" do not amount to sexual harassment) (internal quotation marks and citation omitted). The facts, when viewed in the light most favorable to Jennings, show that Dorrance's persistent, sex-oriented discussions, both in team settings and in private, were degrading and humiliating to his players because they were women. His conduct went far beyond simple teasing and qualified as sexual harassment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Ocheltree*, 335 F.3d at 332.

Dorrance, in front of the entire team, frequently singled out individual players to find out whether, with whom, and how often they were having sex. He put the questions crudely and bluntly, asking, for example, "[Who is your] fuck of the week[?]", J.A. 1237, "[Are you] going to fuck [your boyfriend] and leave him[?]", J.A. 1248, and "How many guys in the [lacrosse] team did [you] fuck?", J.A. 1238. As Jennings expected, Dorrance ultimately asked her (albeit in private) a similar question, "Who are you fucking?" J.A. 1330. Dorrance even asked one player about the size of her boyfriend's genitalia and suggested to another that she "just had to keep [her] knees together." J.A. 1127. Dorrance fixated on one player's large breasts, pronouncing that they made her top-heavy and gave her poor balance. These sorts of questions and comments, which frequently carried the strong suggestion of promiscuity, provoked in several players acute feelings of humiliation and degradation that were directly linked to their gender. The nature of Dorrance's language, in other words, establishes that he was targeting the young women because of their sex. *See Ocheltree*, 335 F.3d at 332. Finally, Dorrance's reckless comments about his sexual fantasies — to a trainer that he would like to have group sex with his Asian players and to Debbie Keller that he would like to be a fly on the wall the first time one player had sex — assist in demonstrating that his pronounced interest in discussing his players' sex lives transcended simple teasing or joking. In short, Jennings proffers sufficient facts for a jury to find that Dorrance subjected her to sexual harassment.

### B.

We next consider whether Jennings proffers facts to permit a finding that Dorrance's sex-based harassment was sufficiently severe or

pervasive to create a hostile or abusive environment in the women's soccer program. Harassment reaches the sufficiently severe or pervasive level when it creates "an environment that a reasonable person would find hostile or abusive" and that the victim herself "subjectively perceive[s] . . . to be abusive." *Harris*, 510 U.S. at 21. Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination "depends on a constellation of surrounding circumstances, expectations, and relationships." *Davis*, 526 U.S. at 651 (quoting *Oncale*, 523 U.S. at 82). All the circumstances are examined, including the positions and ages of the harasser and victim, whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it effectively deprived the victim of educational opportunities or benefits. *See Davis*, 526 U.S. at 650-51; *Harris*, 510 U.S. at 23. Evidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances. *See Harris*, 510 U.S. at 19 (considering harassment directed at both plaintiff and her female co-workers); *see also Spriggs*, 242 F.3d at 184 (stating that, "We are, after all, concerned with the 'environment' of . . . hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and [her harasser]."). These standards for judging hostility ensure that Title IX does not become a "general civility code." *See Oncale*, 523 U.S. at 80. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminat[ion]." *Faragher*, 524 U.S. at 788 (internal quotation marks omitted). "Common sense, and an appropriate sensitivity to social context, will enable courts and juries" to identify objectively hostile or abusive conduct. *Oncale*, 523 U.S. at 81-82. Here, a jury could reasonably find that Dorrance's persistent sexual harassment was sufficiently degrading to young women to create a hostile or abusive environment.

Dorrance was not just any college coach. He was and still is the most successful women's soccer coach in U.S. college history, and he has coached the national team. Dorrance thus had tremendous power and influence over a player's opportunity for achievement in the soccer world, both at UNC and beyond. As Jennings put it, "[g]irls would cut off their right arm to be [at UNC]" and play for Dorrance. J.A. 1227. Dorrance encouraged his players to confide in him about all aspects of their personal lives, including the details of their sexual

activities. He professed to them that he wanted to be a father figure. In reality, Dorrance abused his power as coach to ask his players questions a father would not ask; he pried into and talked openly about his players' sex lives in a way that was disrespectful and degrading. The disparity in power between Dorrance and his players trapped players into responding to his questions and enduring the environment. *See Crandall v. N.Y. College of Osteopathic Med.*, 87 F. Supp. 2d 304, 319 (S.D.N.Y. 2000) (denying summary judgment in part because "unequal power relationship" between harasser and victim could support a jury finding of a sexually hostile environment). As the coach, Dorrance controlled everything: team membership, position, playing time, and scholarship eligibility. Even Debbie Keller, the team captain and a star player, was acutely mindful of Dorrance's enormous power and influence, and she took care not to provoke him. Keller was troubled by Dorrance's persistent focus on sex. "[A]ll [of his] comments about his affection" for her, together with the inappropriate touching, "made [her] skin crawl" and made her "fe[el] dirty." J.A. 1145. Dorrance's conduct put constant pressure on Keller because she "didn't want to tick him off to a point . . . where he would take it out on [her] by not playing [her]." J.A. 1120. Jennings similarly described the pressure on players to submit to Dorrance's excessive intrusion into their sex lives: "[H]ow do you say anything [to stop him?] . . . You are stuck between a rock and a hard place." J.A. 1290.

Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment. *Davis*, 521 U.S. at 651. Here, Dorrance was a forty-five-year-old man probing into and commenting about the sexual activities of young women, some of whom, like Jennings, were as young as seventeen. Indeed, Jennings felt the extra pressure of age difference when Dorrance called her to his California hotel room to assess her performance as a freshman player. Jennings describes the scene: "I was 17 when he asked me ['Who are you fucking?'] in a dark hotel room, knee-to-knee, bed not made, sitting at one of those tiny tables." J.A. 1230.

Jennings had good reason to fear that she too would be targeted by Dorrance, for he had subjected her to a general environment of sexual harassment. She had witnessed his degrading and persistent focus on

the sex lives of other players. She observed Dorrance's sex-based humiliation of several of her teammates, and she heard his demeaning comments. Dorrance openly accused at least three players of being promiscuous, asking them degrading questions such as, "Is there a guy you haven't fucked yet?". J.A. 1261-62. Dorrance turned news about visits by boyfriends into speculation about rampant sex. Thus, he asked one player whether she was going to have a "shag fest" when her boyfriend visited, and whether she was "going to fuck him and leave him." J.A. 1248.

No aspect of his players' sex lives appeared off limits for Dorrance. He asked one player about the size of her boyfriend's genitalia. He mocked a lesbian player by calling her "Chuck" and asking in front of the team why "she [did] not like the guys." J.A. 1283. He expressed his fantasies to a trainer about wanting to have group sex with his Asian players (this Jennings overheard) and to Keller about his voyeuristic interest in watching the first time one player, whom Dorrance believed was a virgin with repressed sexual desire, had intercourse. These two private incidents together with overt displays of affection toward Keller and his graphic comments about the "nice rack[s]" or "nice legs" of certain players, J.A. 1229, 1236, indicate that Dorrance viewed at least some of his players as sexual objects.

Dorrance's sex-based verbal abuse permeated team settings. It is described by players as occurring frequently, often during team warm-up time, on a typical Monday afternoon (the first practice date after the weekend), or any time the team was together, whether at home or traveling. According to Jennings, two players in particular were targeted with humiliating comments or questions about their sex lives almost every day or every other day.

Dorrance's persistent talk about his players' sex lives caused Jennings to live in constant fear that he would at some point direct his "filthy comments" at her, as he shifted his focus from player to player. J.A. 1243. Jennings tried to stay off of Dorrance's "radar" when he was on the topic of sex, J.A. 1242, but she was nevertheless targeted in the team setting. Thus, in a team warm-up session during Jennings's sophomore year, Dorrance asked whether Jennings had had "the same good weekend" with her boyfriend as a player whose weekend he had just described as a "shag fest." J.A. 1248. Jennings was

humiliated by this question and did not respond. A jury could reasonably find that Dorrance's two incidents (the hotel room encounter being the first) of direct harassment of Jennings were more abusive in light of the general, sexually charged environment. In other words, the incidents were not isolated events, but were part of an abusive pattern that instilled fear and dread.

The sexually charged atmosphere perpetuated by Dorrance left other players besides Jennings with feelings of humiliation and discomfort. Keller was repulsed by Dorrance's inappropriate touching, and she regarded it as "kind of sick" when he told her he "want[ed] to watch [her] friend have sex." J.A. 1069. Amy Steelman "was shocked by the pervasive and frequent [sexual] discussions" that Dorrance "frequently provoked" and "always encouraged;" she felt "very uncomfortable with his sexually charged environment," and she "would frequently [go] home crying" as a result. J.A. 1452. Both Jennings and Steelman observed that Dorrance's comments visibly upset other players as well. One, who was constantly portrayed by Dorrance as sexually promiscuous, was reduced to tears as a result of his accusations. Still another got an upset or disgusted look on her face after Dorrance focused on her breasts (her "rack," as he put it) and called her top heavy. J.A. 1270-71. A lesbian player, whose sexual orientation was highlighted by Dorrance, was noticeably bothered by this attention. Evidence that other players shared Jennings's humiliation and discomfort assists in showing that she was objectively reasonable in finding the environment hostile and abusive. *Cf. Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 747 (2d Cir. 2003) (characterizing reactions of plaintiff's peers to conduct directed at plaintiff as "significant to the mandated objective analysis" of whether conduct was sufficiently severe to be actionable under Title IX).

In sum, Jennings has proffered sufficient facts for a jury to find that Dorrance's degrading and humiliating conduct was sufficiently severe or pervasive to create a sexually hostile environment. This conclusion takes into account the informal, sometimes jocular, college sports team atmosphere that fosters familiarity and close relationships between coaches and players. A male coach might use sexual slang in front of his women players, and the players might do the same in front of the coach. Title IX is not a civility code for the male coach who coaches women, and it is not meant to punish such a coach for

off-color language that is not aimed to degrade or intimidate. What happened in this case, if Jennings's version of the facts is believed, is that Dorrance took advantage of the informal team setting to cross the line and engage in real sexual harassment that created a hostile or abusive environment.

A Title IX plaintiff completes her hostile environment showing at the summary judgment stage if, based on her proffered evidence, the sexual harassment "*can be said* to deprive [her] of access to . . . educational opportunities or benefits." *Davis*, 526 U.S. at 650 (emphasis added). *Davis* explains that a sexual harassment victim "can be said" to have been deprived of access to educational opportunities or benefits in several circumstances, including when the harassment (1) results in the physical exclusion of the victim from an educational program or activity; (2) "so undermines and detracts from the victim['s] educational experience" as to "effectively den[y her] equal access to an institution's resources and opportunities"; or (3) has "a concrete, negative effect on [the victim's] ability" to participate in an educational program or activity. *Id.* at 650-51, 654.[2] These alternative ways of showing deprivation or harm are rooted in the statute. Specifically, Title IX states that a covered institution cannot, on the basis of sex, (1) "exclude[ ] [a person] from participation in," (2) "den[y] [a person] the benefits of," or (3) subject[ ] [a person] to discrimination under any education program or activity." 20 U.S.C. § 1681(a). *Davis* hews to the statute in pointing out that sexual harassment reaches the level of actionable discrimination when it has "a concrete, negative effect on [the victim's] ability" to participate in a program or activity. *See Davis*, 526 U.S. at 654. Thus, in relying on *Davis*'s

---

[2]*Davis*'s deprivation standard was formulated in the context of student-on-student harassment. The Supreme Court thus recognized "the practical realities [faced by a school in] responding to student behavior," noting that "children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651, 653. The Court expressly acknowledged that "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee . . . and to have a systemic effect on a program or activity." *Id.* at 653. Student-on-student "harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment" or coach-student harassment. *Id.*

"concrete, negative effect" language in the discussion that follows, we have neither gutted that case's deprivation standard nor contravened the text of the statute, as the dissent suggests. *See post* at 45. In all events, the burden of showing a concrete, negative effect is sufficiently rigorous. It is, in simple terms, an effect that is concrete (or real), negative, and substantial.

Jennings has met the burden here with evidence showing that Dorrance's severe and pervasive sexual harassment concretely and negatively affected her ability to participate in the soccer program. She testified that the hostile atmosphere created by Dorrance made her feel humiliated, anxious, and uncomfortable; these effects, in turn, had a negative impact on her participation and performance in soccer and on her academic performance. Jennings's testimony is supported by a psychiatrist's opinion that Dorrance's destructive practice of verbal sexual abuse caused her to suffer severe emotional distress.

The dissent suggests that the slight improvements in Jennings's grades, her belief that she was improving as a player, and her surprise and disappointment at being cut do not depict a player who has been effectively "denied the educational opportunity of playing on the team." *Post* at 52. This evidence does not prevent Jennings from establishing that she has a triable issue on the last part of the hostile environment element of her Title IX claim. If anything, it shows how hard Jennings was trying, and what she believed she was achieving, in spite of the hostile environment. When Dorrance cut Jennings from the team *in the middle of exams* in May 1998, her cumulative GPA was 1.964, below passing. When she finished exams, and the grades were recorded, her GPA was 2.022, barely above passing. This subpar academic performance gives substance to Jennings's testimony that her GPA was so low because the hostile soccer environment made it difficult for her to focus on her studies.

Likewise, Jennings's acknowledgment that she was disappointed at being cut does not, at the summary judgment stage, defeat her evidence that she was harmed by the hostile environment, both emotionally and in her performance as a player. Jennings was understandably disappointed because she had lost the opportunity to play on the country's premier women's college soccer team. Her disappointment, however, does not detract from the fact that she had to endure sexual

harassment in order to play. A jury could reasonably find that the harassment interfered substantially with Jennings's ability to participate in the soccer program, notwithstanding her desire to stay on the team. At practice, for example, Jennings was in constant fear that Dorrance would direct his questions about sexual activities to her. This prompted her to concentrate on "stay[ing] out of [Dorrance's] radar" when he was on the subject of sex. J.A. 1242. This surely had a negative effect on her ability to concentrate on soccer. Moreover, the general, sex-charged environment that Dorrance perpetuated caused Jennings to feel humiliated, anxious, and uncomfortable. A jury could reasonably agree with her that the burden of these feelings had a "negative[ ] impact[ ]" on her "performance on the soccer field." J.A. 1585. In sum, a jury could find that the total impact of Dorrance's severe and pervasive harassment, including the severe emotional distress it caused Jennings to suffer, had a concrete, negative effect on her ability to participate in the soccer program.

C.

Finally, Jennings must provide a basis for imputing liability to UNC for Dorrance's conduct. An institution can be held liable for a Title IX violation only if "an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond" or displays "deliberate indifference" to discrimination. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Jennings's facts show that in the fall of 1996 Jennings met with Susan Ehringhaus, Assistant to the Chancellor and counsel to the University. Ehringhaus was UNC's highest ranking lawyer and an official responsible for fielding sexual harassment complaints. Jennings informed Ehringhaus that Dorrance had created an abusive environment in the women's soccer program. Ehringhaus was given vivid details of Dorrance's sexual comments about his players when the team was together. Jennings also reported that the situation was causing her intense feelings of discomfort and humiliation. Ehringhaus dismissed this complaint by telling Jennings that Dorrance was a "great guy" and that she should work out her problems directly with him. J.A. 1341-42. Ehringhaus took no action on the complaint, and

Dorrance's harassment continued. These facts are sufficient to establish that Jennings gave Ehringhaus, and by extension UNC, actual notice of the hostile environment created by Dorrance. This notice and the University's failure to take any action to remedy the situation would allow a rational jury to find deliberate indifference to ongoing discrimination.

* * *

For the foregoing reasons, Jennings has presented sufficient evidence to raise triable questions of fact on all disputed elements of her Title IX claim against UNC, and the district court erred in granting the University's motion for summary judgment.

### III.

Jennings asserts § 1983 claims for sexual harassment against Dorrance, Ehringhaus, and several other individuals who were employed by UNC. These defendants, according to Jennings, acted "under color of" state law to deprive her of "rights, privileges or immunities secured by the Constitution and laws" of the United States, 42 U.S.C. § 1983, specifically her Fourteenth Amendment equal protection right to be free from sexual harassment in an educational setting, *see Hayut*, 352 F.3d at 743-44. The district court granted summary judgment to all of the individual defendants on these claims, but we conclude that Jennings has triable claims against Dorrance and Ehringhaus.

To survive Dorrance's motion for summary judgment on her § 1983 sexual harassment claim against him, Jennings must show that he was a state actor, he harassed her because of sex, and the harassment was sufficiently severe or pervasive to interfere unreasonably with her educational activities. *See id.* at 744 (explaining that § 1983 sexual harassment claims based on a hostile environment theory "are governed by traditional Title VII . . . jurisprudence"). First, "'[s]tate employment is generally sufficient to render the defendant a state actor,'" and a defendant necessarily "acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49-50 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n.18 (1982)). As we spell out in detail in part

II, *supra*, Jennings has proffered evidence (1) that Dorrance was a state actor, functioning in his capacity as a coach, when he engaged in sexual harassment and (2) that the harassment was sufficiently severe or pervasive to interfere with her educational activities. The district court therefore erred in granting summary judgment to Dorrance on the § 1983 claim for sexual harassment.

The district court correctly granted summary judgment on identical § 1983 claims against three of Dorrance's subordinates, assistant coaches William Palladino and Chris Ducar, and the athletic trainer, Bill Prentice. Jennings has not offered evidence that the three subordinates participated in sexual harassment.

Jennings's § 1983 claim against Ehringhaus is based on the theory of supervisory liability. *See Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) ("It is well settled that 'supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.'" (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)). Jennings proffers evidence that Ehringhaus, as an administrative official with authority to take action against Dorrance, failed to act and thereby allowed Dorrance's sexual harassment to continue unchecked. More specifically, Jennings's evidence would allow a jury to find that Ehringhaus had actual knowledge of Dorrance's misconduct; that her response was "so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and that there exists "an affirmative causal link" between Ehringhaus's inaction and Jennings's constitutional injury. *See Baynard*, 268 F.3d at 235 (quoting *Shaw*, 13 F.3d at 799). Ehringhaus is therefore not entitled to summary judgment on Jennings's § 1983 claim against her for supervisory liability.

Summary judgment on this claim was properly awarded to the estate of Michael Hooker (former UNC Chancellor) and to other current or past UNC officials, Richard Baddour, Beth Miller, and John Swofford. There is no evidence that any of these officials learned of Dorrance's behavior until Jennings was cut from the team. Nor does Jennings suggest that these individuals supported any official policy that enabled the harassment.

Dorrance and Ehringhaus have preserved the issue of qualified immunity. In their summary judgment papers the individual defen-

dants raised qualified immunity as a defense on the § 1983 claims, but gave the issue secondary attention. The district court did not address the question. On appeal the defendants assert qualified immunity as an alternative argument, again giving the matter limited treatment. These circumstances prompt us to decline to consider the question, and thus allow the district court to address it in the first instance on remand. *See Brown v. United States*, 851 F.2d 615, 620 (3d Cir. 1988) (declining to exercise the power to consider qualified immunity in the first instance on appeal).

IV.

The remaining issues raised by Jennings may be dealt with in short fashion. She argues that the district court erred in awarding summary judgment to the individual defendants on her constitutional right to privacy claim brought under § 1983 and to Dorrance on her common law privacy claim. Here, we affirm the district court because none of the defendants either required Jennings to disclose personal information or invaded her records to discover such information. *Cf. Thorne v. City of El Segundo*, 726 F.2d 459, 468-69 (9th Cir. 1983) (finding a constitutional violation where a public job applicant was required to answer questions about her sexual activity as a condition of employment); *Toomer v. Garrett*, 574 S.E. 2d 76, 90 (N.C. Ct. App. 2002) (stating that the privacy invasion tort includes intrusions such as trespassing, eavesdropping, and peeping into windows). Finally, Jennings argues that the district court erred in denying two of her motions: (1) the motion to strike the defendants' answer on the ground that their denial of one allegation in the complaint was inconsistent with Dorrance's deposition testimony, and (2) the motion to strike, as not properly authenticated, certain exhibits (team records) accompanying Dorrance's affidavit. After considering the arguments and materials relating to these motions, we conclude that the district court did not abuse its discretion in denying them.

V.

For the reasons stated above, we vacate the district court's grant of summary judgment on Jennings's Title IX claim against UNC, her § 1983 claim against Dorrance for sexual harassment, and her § 1983 claim against Ehringhaus for sexual harassment based on supervisory

liability. We affirm the grant of summary judgment on Jennings's remaining claims against the individual defendants, and we affirm the procedural rulings. The case is remanded for further proceedings on the open Title IX and § 1983 claims.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

GREGORY, Circuit Judge, concurring:

This appeal presents the difficult issue of whether an admittedly inappropriate environment created by a women's collegiate soccer coach was sufficiently hostile to deprive a player of the benefits of or participation in the team or her education. Because I believe that Melissa Jennings has presented enough evidence, when viewed in the light most favorable to her, to create a triable issue of fact on her Title IX claim, I vote to reverse the district court's grant of summary judgment. I write separately from the thoughtful majority opinion to express additional thoughts and to respond to specific arguments raised in the well-written dissent.

I.

I agree with the majority that Anson Dorrance's sexually explicit, inappropriate, and harassing comments directed to other players on the team, but overheard by Jennings, are relevant to determining whether Jennings was subjected to a hostile environment.* *See ante*

---

*I agree with the majority that we may consider comments: (1) made in Jennings's presence; (2) made outside her presence, but consistent with her account; and (3) made before her tenure on the team, but discussed in her presence. *Cf. Schwapp v. Town of Avon*, 118 F.3d 106, 110-12 (2d Cir. 1997) ("[I]ncidents . . . occurring before [plaintiff's] tenure may be of limited probative value, but cannot be ignored on summary judgment."); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) (stating that in reviewing hostile environment claim courts may consider "the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction to its environs").

at 11. Although the majority of hostile environment cases involve conduct directed at the plaintiff, unlike the dissent, I do not find evidence that "the Supreme Court itself has assumed throughout its Title VII and Title IX cases that only harassment *directed* and *targeted* at the victim was capable of creating a hostile environment." *Post* at 48. *Meritor Savings Bank, FSB v. Vinson* held that hostile environment claims were cognizable under Title VII because the Act "affords employees the right to work in *an environment* free from discriminatory intimidation, ridicule, and insult." 477 U.S. 57, 65 (1986) (emphasis added). *Meritor* cited *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), a case recognizing a hostile environment as potentially violative of Title VII where the employer provided discriminatory service to its Hispanic clientele rather than any direct action against its Hispanic employees. Further, the Circuit Court opinion in *Meritor* explicitly recognized that "[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive." *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir. 1985), *aff'd in relevant part, rev'd in part*, *Meritor*, 477 U.S. 57.

This view fully accords with this Circuit's decision in *Spriggs v. Diamond Auto Glass*, a hostile environment case where we noted that "[w]e are, after all, concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor." 242 F.3d 179, 184 (4th Cir. 2001) (citing *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) ("[R]acist attacks need not be directed at the complainant in order to create a hostile educational environment."); *Vinson*, 753 F.2d at 146; *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982) ("The fact that many of the epithets were not directed at [the plaintiff] is not determinative. The offensive language often was used in [his] presence after he had voiced objections to [his employer].")); *accord Jackson v. Quanex Corp.*, 191 F.3d 647, 660-61 (6th Cir. 1999) (noting that the court may consider employer conduct directed towards entire minority group, even in individual Title VII action, and that such conduct was relevant to question of whether environment was subjectively and objectively hostile); *Schwapp*, 118 F.3d at 111 ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns

second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." (citation omitted)); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) ("A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her.").

As the majority explains, Dorrance's comments may have singled out individual players at any given practice, but his actions created a "general environment of sexual harassment," *ante* at 12, where young women under his control were the subject of humiliating and degrading comments, frequently on the basis of their alleged promiscuity, *see ante* at 10. I believe that a rational jury could find that this environment, which included the two specific incidents directed toward Jennings, constituted a pervasive hostile environment. Drawing inferences in Jennings's favor, a rational jury could find that Jennings "live[d] in constant fear" that Dorrance would turn his attention to her. *Ante* at 13. Indeed, this fear became a reality during the encounter between Jennings and Dorrance in a hotel room at the end of her freshman year.

## II.

I agree with the dissent that Dorrance's hotel-room inquiry to Jennings was plainly vulgar. The dissent concludes, however, that the question was "obviously an inquiry about what was occupying Jennings' time." *Post* at 50. While I agree that a coach would inquire as to whether a player was having personal problems, on this record, taking inferences in Jennings's favor, I do not think we can conclude as a matter of law that the question was "not made in an attempt to humiliate, degrade, and demean." *Post* at 50.

First, as the majority notes, Dorrance's remarks to his players "frequently carried the strong suggestion of promiscuity," *ante* at 10, often employing the same vulgar construction he used with Jennings. He asked players who their "fuck of the week" was, J.A. 1237, if a certain player was "going to fuck [her boyfriend] and leave him," J.A. 1248, and another player, "[h]ow many guys in the [lacrosse] team did [she] fuck," J.A. 1238. Because Jennings had heard those remarks and practiced her sport in the abusive environment engendered by

them, a rational jury could conclude that Dorrance's hotel-room inquiry was an attempt to humiliate, degrade, and demean her on the basis of sex. Furthermore, Dorrance's question assumed that Jennings was engaged in a sexual relationship, unlike a question that would have simply asked whether she was having "boy" or "relationship" problems. To Jennings, the assumption that she was engaged in sexual relations at all offended. *See* J.A. 1332 ("[Dorrance] asking me if I'm fucking anybody would be the assumption of . . . . I don't think anybody would ask that question, unless you are assuming they already had sexual relationships."). In all candor, it is a close issue whether Jennings's subjective view meets the objective standard. In this case, however, I believe that a rational jury could find the remark objectively offensive because of the age difference between Dorrance and Jennings, Dorrance's position of power and trust, and, most importantly, the link between Dorrance's knowledge of whether a player engaged in sexual activity and his harassment implying that player's promiscuity.

Finally, omitted from both the majority and dissent's version of the hotel-room conversation, is the fact that Dorrance, directly after asking Jennings with whom she was having sex, commented that Jennings should feel comfortable sharing things with him—even things she could not share with her father—because he was like a father figure. J.A. 1325. Given this comment and Jennings's knowledge that Dorrance showed open affection for a fellow team member (Debbie Keller), I do not believe that as a matter of law Dorrance's question was not "focus[ed] on sex" and not posed because of Jennings's gender. *Post* at 50; *see Wills v. Brown Univ.*, 184 F.3d 20, 39 (1st Cir. 1999) (Lipez, J., dissenting) (recounting facts of case involving college professor telling student "I want to be close to you like father-daughter," during study sessions that included professor fondling student).

In sum, while the hotel-room remark can be viewed as a mere poorly phrased inquiry from a coach to a player about whether relationship problems were interfering with her athletic performance, such a conclusion would require us to draw inferences in favor of Dorrance, contrary to our standard of review. Taking into account the factors discussed above, a rational jury could conclude that Dor-

rance's vulgar inquiry was sexual harassment and "part of an abusive pattern that instilled fear and dread." *Ante* at 14.

### III.

As noted by the majority, a Title IX plaintiff must proffer evidence that the hostile or abusive nature of the environment "ha[d] 'a concrete, negative effect on [the victim's] ability' to participate in an educational program or activity." *Ante* at 15-16 (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650-51, 654 (1999)). In this case, the proper inquiry is whether the record contains enough evidence to allow a rational jury to conclude that the hostile environment created by Dorrance effectively denied Jennings the benefits of membership on the women's soccer team and enrollment at the University of North Carolina at Chapel Hill ("UNC") by making it much more difficult for her to develop and achieve as a student-athlete. *See Gabrielle M. v. Park Forest-Chicago Heights, Il. Sch. Dist. 163*, 315 F.3d 817, 828 (7th Cir. 2003) (Rovner, J., concurring in part and concurring in the judgment); *cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring) ("'[T]he plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment.' It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to 'ma[k]e it more difficult to do the job.'" (alteration in original) (citation omitted) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988))).

### A.

While I believe that a plaintiff's grades are relevant to the question of the concrete and negative effect of harassment, an increase or decrease in grades is not dispositive. *See, e.g.*, *Gabrielle M.*, 315 F.3d at 828 (Rovner, J., concurring in part and concurring in the judgment) (noting, in case concerning elementary school student, the fact "that [the plaintiff's] grades did not suffer is by no means dispositive"); *Montgomery v. Ind. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1094 (D. Minn. 2000) ("[G]rades are not the sole benefit to be derived by a student from an educational experience."). In this case, Jennings's grade point average increased from 1.538 at the end of her first semester in the Fall of 1996 to a cumulative average of 2.022 at the

end of her sophomore year, when she was dismissed from the soccer team. J.A. 1449. I disagree with the dissent's conclusion that an improvement in grades is evidence of the lack of discriminatory impact. *See post* at 52. Discriminatory impact would be shown if Jennings's grades, though improved, had risen less than they would have had she not been subjected to a hostile environment. In this case, I believe that Jennings has proffered sufficient evidence to allow a jury to conclude that the hostile environment created by Dorrance affected her academic performance to such an extent that she was deprived of equal access to the benefits of an education at UNC.

During her deposition, Jennings testified that her grade point average was low during her time on the team because she was unhappy and uncomfortable due to the hostile environment created by Dorrance. J.A. 1320. Jennings specifically stated that she "found it hard to focus by just the constant—by the environment that was created—it was very hard to focus." J.A. 1321. When pressed, Jennings stated that it was the hostile environment created by Dorrance that affected her academic performance, rather than her teammates, her shortcomings as a soccer player, or her coaches' criticism of her soccer ability. *See* J.A. 1322-23 ("Q. Was the fact that other girls on the team were critical of your performance as a soccer player part of what was affecting your performance at school? A. No. Like I said before, it was the drinking comments, the comments made about all the girls, and their sexual stuff that just made me uncomfortable."). As noted by the majority, this testimony is supported by a psychiatrist's opinion that stress caused by the hostile environment contributed to Jennings's poor academic performance. J.A. 1583. Despite the subsequent increase in Jennings's grade point average, a rational jury could find, on the basis of her testimony and her expert witness, that her poor academic performance was a result of her lack of focus due to the hostile environment created by Dorrance or that her grades would have increased even more but for the hostile environment. *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 748 (2d Cir. 2003) (noting that despite student's steady academic performance during the period of harassment, her testimony that she was unable to sleep and did not want to attend classes and thus could not concentrate on her studies due to harassment was enough evidence to render the issue one for the jury); *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 227-28 (D. Conn. 2006)(finding daily verbal and some physical

harassment undermined educational experience despite plaintiff's ability to maintain her good grades).

B.

The dissent implies that Dorrance's harassment could not have interfered with or denied Jennings the full educational opportunity of playing on the UNC women's soccer team because she attempted to improve her play and was dismayed at being cut from the team. *See post* at 52. In essence, the dissent concludes that because Jennings did her best to avoid Dorrance and his abuse, but still made the most of her time on the team and as a student at UNC, she has forfeited her cause of action. This implication turns Title IX on its head. *Cf. Gabrielle M.*, 315 F.3d at 829 (Rovner, J., concurring in part and concurring in the judgment) ("Neither [the plaintiff] nor future victims of schoolplace harassment should be penalized simply because they seem resilient."); *Hayut*, 352 F.3d at 749 ("[W]hat students put up with, without objection or protest, does not mark the bounds of permissible classroom conduct."); *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982) ("[A] requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.").

The evidence reflects that Jennings's attempts to make the most of her team experience did not involve increasing her interaction with Dorrance, but rather with her teammates. For example, in the Spring of 1998, prior to being cut from the team, Jennings hosted a team party at her home and participated in hazing events. J.A. 1365-66. Jennings described her relationship with Dorrance during that time period as not "friendly" or "cozy": "It was just he was a coach and I was a player, and I did my thing. It wasn't that 'Hey, how are you doing,' . . . . I would get a nod; that is about it." J.A. 1374. Indeed, Jennings characterized herself as "continuing to pull away from" Dorrance during that time period. J.A. 1374. Thus, while Jennings was attempting to improve her play, her interactions with Dorrance grew more limited and her increased participation in the team took the form of increased socializing with her teammates.

A rational jury could view Jennings as having been denied the full opportunity to achieve her potential as a member of the UNC

women's soccer team, despite her "growing desire to remain with the team." *Post* at 52. For example, a jury could view Dorrance to have, in effect, conditioned the receipt of his coaching and advice on acceptance of his sexual banter, a practice which denied Jennings equal access to the benefits of team membership. *Cf. Wills* 184 F.3d at 30 (noting that it is an open question whether the denial of informal tutoring from a professor is an educational benefit that could form the basis of a Title IX suit).

The dissent ignores the special context of Title IX. Unlike an employee-plaintiff in a Title VII action, if Jennings wished to remain a student at UNC and a member of a varsity soccer team, she had to remain a member of Dorrance's soccer team. Jennings was, of course, free to transfer, and had she done so as a result of Dorrance's harassment, she would have been even further deprived of the educational opportunities of UNC. *See, e.g.*, *Hayut*, 352 F.3d at 750 (viewing student's withdrawal from a university because of sexual harassment as depriving the student of educational opportunities of university). In sum, a rational jury could find that Jennings, who had played competitive soccer since the age of six, including stints on boys teams, was deprived of the educational advantage of UNC's soccer program, despite her attempts to improve and her disappointment when she was cut from the team, because of Dorrance's harassment.

IV.

This is a difficult case, but I ultimately believe that Jennings has presented enough evidence for her Title IX claims to move forward. Drawing inferences in Jennings's favor, a jury could conclude that the pervasive, hostile environment, resulting from Dorrance's conduct, amounted to sexual harassment and effectively deprived her of the educational benefits of being a student-athlete at the University. For the reasons stated above, the district court's grant of summary judgment should be reversed. Accordingly, I concur in the majority's opinion.

Judge Motz has requested that she is shown as joining this opinion.

NIEMEYER, Circuit Judge, dissenting:

This case raises the question of whether Melissa Jennings, a member of the University of North Carolina ("UNC") women's soccer

team for the 1996 and 1997 seasons was, by reason of sexual discrimination, "deprive[d] . . . of access to the educational opportunities or benefits provided by the school," in violation of Title IX, 20 U.S.C. § 1681(a). *Davis v. Monroe Co. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

After being warned repeatedly about both her academic and athletic performance, Jennings was cut from the soccer team in May 1998, before the beginning of the 1998 season. By her own account, Jennings did not want to leave the team, and she was not expecting to get cut but rather expected to hear that she had improved. At the time, Jennings' cumulative grade point average was 1.964 on a 4.0 scale, up from the previous year's 1.538. But she was still at or near the bottom of the team's training performance levels and was a third- or fourth-string goalkeeper. She had played in only one regular season game during her first year and in one or two during her second year.

Only after Jennings was cut did her father write a letter to the general counsel of UNC, complaining about sexual harassment of his daughter during the previous two years. A few months later, Jennings commenced this action. The district court granted UNC's motion for summary judgment, and I would affirm.

During the two-year period of which Jennings complains, she alleged no deprivation of an educational opportunity by reason of sexual discrimination. She does allege (1) much sexual talk during practices by teammates and her coach, Anson Dorrance; (2) two innocuous comments directed at her by teammates and Coach Dorrance; and (3) a conversation during her annual evaluation meeting during which Coach Dorrance was trying to understand the reasons for Jennings' poor academic performance. He asked, "What is going on in [your] social life? Is that affecting [your] grades? Is that affecting [you] as a player? Who are you f**king? Is that affecting your grades?"

Jennings does not allege that she was cut from the soccer team because of sexual discrimination or that she played any less because of sexual discrimination. She also does not allege any touching, advances, or offers of sex. Her claim amounts to a complaint about the vulgarity of the pervasive locker room-style talk by teammates

and her coach that attended team practices. In these circumstances, the district court was correct in concluding that the facts do not create a triable issue as to a violation of Title IX, and therefore, I respectfully dissent.

I

To give Jennings the full benefit of the facts in the summary judgment record, it is necessary to set them forth carefully and in some detail. This is especially important because Jennings (as well as the majority) has tended to rely on completely irrelevant incidents that occurred even before she entered UNC as a freshman; that she never knew about; and that she learned only from the testimony given in this case.[1]

A

Melissa Jennings began playing goalkeeper on soccer teams when she was 12 years old. She performed so well that within a few years

---

[1]For instance, the majority repeatedly relies on Dorrance's "fly on the wall" comment without mentioning that Dorrance allegedly made this comment to Debbie Keller, the team captain, in the spring of 1994 — *more than two years before* Jennings enrolled at UNC. (J.A. 1068.) The majority also relies on numerous instances about which Jennings never had any knowledge — nothing in the record imputes them to Jennings' knowledge, and Jennings herself never referred to them, even though she testified to every incident of which she had any awareness. (J.A. 1430-31.) Thus, the majority relies on the fact that Dorrance told a player "to keep your knees together . . . you can't make it so easy for them" or asked another whether she was "going to have sex with the entire lacrosse team." (J.A. 1127.) But Jennings never heard those comments. Jennings also never testified knowing that Dorrance asked a player about the size of her boyfriend's genitalia. (J.A. 1452.) Similarly, the majority relies on the fact that Dorrance showed overt affection for Keller. But Jennings' only testimony in this regard is in relation to the weight room incident, which she described as follows: "[W]e are in the weight room, [Debbie Keller] goes off and talks with [Dorrance] in the bleachers." (J.A. 1290.) Finally, neither Jennings nor Keller ever testified that Dorrance "dangl[ed] his hand in front of [Keller's] chest," (J.A. 1452-53), as relied on by the majority.

she was the first-string goalie on an elite youth soccer club. (J.A. 1199, 1200.) After graduating from high school, Jennings went on a recruiting trip to the University of Kansas and verbally committed to play for its women's soccer team. (J.A. 1217.) Despite her verbal commitment to Kansas, Jennings wished to play soccer at UNC at Chapel Hill because she "knew it was the number one school. It ha[d] all the national titles." (J.A. 1216.)

The UNC women's soccer team, which Anson Dorrance has coached since its inception in 1979, has long been the dominant program in the sport, winning 19 of 26 national titles, including the national title in 2006. Because of the program's dominance, Jennings called Dorrance and expressed her interest. (J.A. 1216.)

Dorrance was familiar with Jennings because of a UNC soccer camp that she had attended, and he asked her if she had already committed elsewhere. After finding out about her Kansas commitment, he told her to speak with Kansas' head coach to see if Jennings could visit Chapel Hill. (J.A. 1217-18, 1221.) Jennings did visit UNC and ultimately joined its soccer team as a walk-on recruit. Dorrance did not recommend her for a scholarship. (J.A. 181.)

During Jennings' freshman season, in the fall of 1996, she was the third- or fourth-string goalkeeper and played in one preseason game and one regular season game. (J.A. 1334.) The team held practice every weekday afternoon during the fall and on Saturday mornings, except on game days. (J.A. 1042-43.) During the first 10-15 minutes of practice, before the formal drills began, the players had what they called "team time," during which they would warm up, run a lap, and stretch as a group. (J.A. 1046-47.) Debbie Keller, the team captain in 1996, described these warm-ups as a time "at the beginning of practice to talk about our day and then get serious for practice," to "talk about . . . anything that would interfere with your concentrating on practice." (J.A. 1044-45.)

The environment during team time was casual and informal, and the women joked and conversed about a range of topics, invariably talking about their social activities and their personal lives, including their sex lives. They talked about the "parties they had been to," whom they were dating, and "who they hooked up with." (J.A. 1047-

51.) Some girls discussed "intimate sexual details," (J.A. 1052), giving "in full detail, start to finish," an account of "the night they spent with some guy," including the "different sexual acts they performed." (J.A. 1054.) According to Keller, these players openly shared "too much info." (J.A. 1055.) Others discussed the numerous sexual exploits they had undertaken within a short period of time. (J.A. 1055, 1058.) While most of the sex talk among the women during team time was more general than descriptive, like whether they "had sex" or whom they had "hooked up with," (J.A. 1041, 1056), Keller testified that "anywhere between five to ten times" per season, the women gave "graphic," "full detail," "start to finish" descriptions of their sexual experiences. (J.A. 1054-55.)

Not all of the women discussed their sex lives so openly and in such detail during team time. Keller described degrees of openness among the players, with some women being "very wide open about" their personal and sex lives, others being intermediately so, and still others keeping their personal lives completely private. (J.A. 1053-56.) Jennings fell into the last group, testifying in deposition that she did not participate in her teammates' sex-themed conversations. (J.A. 1242, 1244.)

Once or twice a week, Coach Dorrance mingled with his players during team time, walking among them as they stretched and warmed up. (J.A. 1061.) The players' team-time conversations were free-flowing, and Dorrance did not regulate their content. To the contrary, Dorrance regularly stopped and participated in these informal conversations, "joking around with different girls about their evenings before or just who they're dating." (J.A. 1057.) At times, Dorrance asked whether the players had been out drinking, and if so, how much. (J.A. 1067.) He also asked about team members' families. (J.A. 1067.)

Because some of the women openly discussed their sex lives, Dorrance overheard some of their more frank discussions as he walked among them. According to Keller, "occasionally" and certainly not "every time that he walked through," Dorrance would pause and engage in these discussions, commenting on his players' "personal dating [and] sex lives." (J.A. 1066.) Keller testified that Dorrance did not confine his comments and inquiries to team time, but talked to his

players at other times when "the team was together," whether "after a game" or when waiting "for rides." (J.A. 1128.) Amy Steelman, who played with Jennings during the 1996 season, remembers the frequency of Dorrance's interventions differently, averring that "[w]hen Anson Dorrance was around, he would encourage and participate in sexual discussions, sexual jokes, sexual talk, sexual banter, and sexual innuendos. A typical Monday afternoon included queries and discussions with Dorrance into the team members' sexual and social exploits, particularly prying into our sex lives." (J.A. 1452.) Jennings commented that "Dorrance's sexual comments and inquiries took place on a regular basis."[2] (J.A. 1585.)

Jennings testified that she never participated in any of the sexual banter engaged in mutually by her teammates and Dorrance. (J.A. 1242-43.) Jennings also testified that Dorrance never directed any of his "team-time" comments at her. (J.A. 1242-43.) Although she did not participate and although she was not targeted, Jennings paid attention to the banter, and she labeled much of what she overheard as inappropriate and humiliating. She testified to only two specific incidents about which she heard, however, to provide content to her general descriptions. First, one player informed the team, in Dorrance's presence, that over the course of an evening, she had sex with a man, crawled out of his window, crawled into another man's window, and had sex with him too. (J.A. 1055, 1058.) Dorrance asked the player whether she knew the names of these men, and whether "she took tickets." (J.A. 1236.) Dorrance also asked this player, who was very open about her promiscuity, who her "f**k of the minute," "f**k of the hour," and "f**k of the week" was, and how "many guys on the [lacrosse] team did she f**k?"[3] (J.A. 1237-38.) Second, another

---

[2]Dorrance has a much different recollection of the facts. In his affidavit, he stated: "I never initiated comments on those topics, only infrequently heard players' comments on those subjects and even less frequently said anything to any player at those times about those subjects." (J.A. 186.) Several former soccer players who were Jennings' teammates at UNC submitted affidavits consistent with Dorrance's version of the facts. (J.A. 320, 324, 330, 332). At this summary judgment stage, of course, these allegations must be ignored, and the truth of the testimony of Jennings, Keller, and Steelman must be accepted.

[3]Keller testified that Dorrance "would use words more like 'promiscuous,'" asking "how many people are you going to sleep with." (J.A. 1127.)

player spoke of a previous weekend with her boyfriend, and Dorrance asked her if she was "going to have a shag fest . . . when he comes to town," and whether she was "going to f**k him and leave him?" (J.A. 1284.)

Beyond these two incidents, Jennings testified about one other particular comment that Dorrance made at practice, although it was neither directed at her nor made in the presence of any player. During a water break, Dorrance was talking to a male athletic trainer, and Jennings overheard them both use the phrase, "Asian threesome." (J.A. 1285.) Jennings heard Dorrance "kind of chuckle" and say, "Oh, yeah," after hearing the phrase. (J.A. 1285.) Jennings interpreted the phrase to be a description of a fantasy involving two of her Asian teammates and one of the men. (J.A. 1284-86.) Jennings also complained of Dorrance's use of profanity, including the words and phrases "f**k," "unf**kingbelievable," "what the f**k," "f**king brilliant," and "f**king stupid." (J.A. 1231-33, 1264-65.) Jennings testified that Dorrance would use such phrases when his players made mistakes, such as when he believed a player made a poor pass. (J.A. 1231.)

Jennings testified that Dorrance would occasionally comment on players' physical attributes, complimenting one player for having "nice legs," (J.A. 1233), and another for having "cute dimples," (J.A. 1229), commenting on "asses in spandex," (J.A. 1229), scorning one as a "fat ass," (J.A. 1228), and referring to one woman's chest as her "rack." (J.A. 1236.) Jennings testified, however, that Dorrance never commented on any of her physical attributes, respectfully or disrespectfully. (J.A. 1243.) Jennings also admitted that Dorrance never threatened her, never touched her, never ogled her, never propositioned her, and never made any form of sexual advance.

In fact, from her two years on the team, Jennings could testify of only two instances when her personal life was mentioned at all during soccer practice while Dorrance was present. The first occurred before practice when Jennings and some teammates were sitting on bleachers lining the soccer practice field with Dorrance nearby. (J.A. 1252-54.) One of the players spoke about her weekend with her boyfriend, and Dorrance asked if it had been a "shag fest." (J.A. 1249.) The teammate, seeking to involve Jennings in the conversation and knowing

that Jennings, whose nickname was "Trim'n" (which, Jennings stated, had no sexual connotation), had visited her boyfriend at a different school the previous weekend, asked, "What about Trim'n?" (J.A. 1246-48, 1252.) Dorrance "chimed in," saying, "yes, what about Trim'n?" (J.A. 1246, 1252.) Jennings ignored the questions asked by her teammate and Dorrance, and left for the practice field to do "goal-keeper stuff." (J.A. 1255.) The second instance occurred during team time when a teammate asked Jennings whether a boy she had seen Jennings hug after the previous day's game was a boyfriend or just a friend. (J.A. 1257-59.) Jennings responded that the boy was just a friend. (J.A. 1258.) As for Dorrance's involvement in the exchange, he was present, but Jennings could not remember whether he said anything. (J.A. 1258.)

As the season progressed, Jennings became concerned about the sexual banter and other issues, and she approached Susan Ehringhaus, then Assistant to the Chancellor and Senior University Counsel, sometime between September and November 1996 to express her concerns. (J.A. 1337-39, 1341.) Jennings trusted Ehringhaus because she was a woman; she was UNC's top legal officer; and Jennings generally felt comfortable with her. (J.A. 1338.) Jennings told Ehringhaus (1) that Dorrance contributed to a "humiliating" and "uncomfortable" environment, giving Ehringhaus "a run-down of what I thought would encompass everything" regarding Dorrance's inappropriate comments, including the specifics of Dorrance asking a team member "who the f**k of the week is." (J.A. 1342-43); (2) that Dorrance failed to visit her in the hospital when she had become sick earlier that semester (J.A. 1335) and failed to mention to the team that her hospital stay was the reason she had missed a game (J.A. 1340); (3) that Dorrance requested that Jennings buy $400 worth of Gatorade for the team and the team's opponent during the water supply disruptions caused by Hurricane Fran and subsequently failed to reimburse her (J.A. 197, 1344-45); and (4) that Dorrance encouraged Jennings to attend parties with her teammates, even though Jennings had told Dorrance that she was underage and alcohol was present at the parties (J.A. 198, 1338-40, 1347-48). Jennings did not relate that any of Dorrance's sexual comments had been directed at her. (J.A. 1346-47.) Ehringhaus stated that Jennings made no complaints about the sexual banter at this meeting or any other meeting until after Jennings had been cut from the team. (J.A. 198.) But according to Jennings, Ehr-

inghaus responded to Jennings' complaints by encouraging her to "work it out with" Dorrance and asking whether she was "taking those comments into context." (J.A. 1342.) Ehringhaus characterized Dorrance as "a great guy" and related that she had "known him for a long time." (J.A. 1342.) To Jennings, Ehringhaus "didn't seem that concerned." (J.A. 1342.)

A short time later, again during the fall of 1996, Jennings approached Ehringhaus for a second time. At this meeting, Jennings focused solely on Dorrance's failure to reimburse her $400 for buying the Gatorade. (J.A. 1346.) Jennings did not mention anything about the sexual banter at practice. (J.A. 1345-46.) Following this meeting, Jennings' father, Craig Jennings, also wrote a letter to the University, complaining of Dorrance's failure to reimburse his daughter the $400. (J.A. 1352-53, 1411, 1543.) His letter did not mention any sexual comments at practice. (J.A. 1543, 1551.) The reimbursement issue was thereafter resolved, and Jennings had no further meetings with Ehringhaus until after she had been cut from the team. (J.A. 1350-51.)

Dorrance had a custom of meeting with each of his players individually at the end of the soccer season for a personal assessment of their performance during the season in the areas of conditioning, skills, and on-field performance; contributions to team chemistry; and academic status. (J.A. 182-83.) For the 1996 season, Dorrance held these end-of-year meetings in his hotel room while the team was in California during December to play in the national championship tournament. (J.A. 1305.) After the player before Jennings had finished her personal progress meeting with Dorrance, Jennings went in, and both she and Dorrance sat down at a table located by the window in his hotel room. (J.A. 1308.)

Dorrance began the conversation with "small talk," asking Jennings such questions as "[H]ow are you doing?" and "[W]hat is going on?" (J.A. 1309.) Dorrance began the substantive portion of the meeting by addressing Jennings' grade point average, which was a 1.538 on a 4.0 scale. (J.A. 1449.) Jennings knew that she was in danger of losing her athletic eligibility due to her poor grades. Dorrance told her that her grades "needed to improve" and that they were "not acceptable." (J.A. 1315, 1316.) He explained how important her grades were, telling her she "ha[d] to study" and "do better in school." (J.A. 1316.)

Seeking to find the reasons for Jennings' poor academic performance, Dorrance asked Jennings if she needed help, inquiring whether she had been visiting the team's academic tutor (which she had been). (J.A. 1318.) According to Jennings, Dorrance then inquired whether Jennings' social life was affecting her grades, asking, "What is going on in [your] social life? Is that affecting [your] grades, is that affecting [you] as a player?" (J.A. 1329-30.) "Who are you f**king?" "Is that affecting your grades?" "[Is that] causing a problem with your grades, with your performance?" (J.A. 1326, 1330.) Jennings was taken aback by the question, and immediately replied that her personal social life was "[n]one of his god damn business." (J.A. 1325, 1331.) Dorrance ceased his inquiry into the possible causes of Jennings' poor academic performance and "started talking about [Jennings'] performance as a player." (J.A. 1327.)

Because Jennings had played in only one game during the year, as well as one preseason game, (J.A. 1334), Dorrance focused his comments on Jennings' conditioning, telling her that her statistics for weightlifting, sprinting, and the like were below team standards and therefore needed to improve. (J.A. 1327.) Dorrance ended the meeting by telling Jennings to "[i]mprove [her] grades, first and foremost, and then . . . improve [her] performance, . . . [and to] fight for that first string, second string position." (J.A. 1333.)

Jennings returned to the soccer team as a sophomore for the fall 1997 season, during which she again had minimal playing time, appearing in one or two games. (J.A. 1356.) Again at the end of the 1997 season in December, Dorrance met individually with each player for a personal progress assessment. At Jennings' meeting, Dorrance discussed her academics, fitness, and contributions to team chemistry. (J.A. 1361.) He commented that Jennings' cumulative GPA had improved to a 1.964 from the previous year's 1.538. (J.A. 1449.) In Jennings' words, Dorrance tried "to push me to continue in a positive manner with my grades. He was acknowledging the fact that I had made the effort." (J.A. 1362.) But he told Jennings that she was still falling short of the team's academic standards. (J.A. 1361.) He also told Jennings that she needed to focus on her fitness and training, commenting that she was not meeting the team's standards in those areas either. (J.A. 1362.) Finally, he encouraged Jennings "to be a positive life source" for the team by cheering for the players from

the sidelines, being "a comforting figure, and [a] positive person, being supportive of teammates, and everything else." (J.A. 1362, 1363.) Dorrance told Jennings that he would have to remove her from the team if she did not improve in each area. (J.A. 1363.) Nothing else was discussed. (J.A. 1365.)

During spring 1998 (the off-season), Jennings made efforts to be more involved in the team's social activities, including hosting recruits, working at the team's concession stand, and even hazing the team's new members. (J.A. 1365-1372.)

On May 5, 1998, after Dorrance had asked each player to complete a self-evaluation and an evaluation of her teammates (J.A. 1391), Dorrance again conducted one-on-one meetings with his players. At Jennings' meeting, Dorrance told her that her training and fitness levels were still below the team's minimum standards (J.A. 1387), that her performance was sub-par (J.A. 1395), and that she therefore "was no longer to be a part of the team." (J.A. 1387.) Jennings was shocked and became "hysterically upset." (J.A. 1392.) Jennings "was not expecting to get cut. I was expecting him to say, 'You know, you've improved.' . . . I thought I had done well. I even did my [skills] testing injured. [I] was, you know, making every possible attempt to do what he had asked." (J.A. 1388.) Dorrance described Jennings' efforts differently, observing that she "has no discipline to improve herself as a player, is a poor student and is bad for chemistry." (J.A. 279.) "Jennings was clearly the worst goalkeeper on the team during the years she played." (J.A. 182.)

A week after Jennings had been cut from the team, her father, Craig Jennings, wrote a letter to Ehringhaus, dated May 12, 1998. (J.A. 1551.) Although Craig Jennings had once before — in the fall of 1996 — written to Ehringhaus to complain about the delayed reimbursement for Jennings' purchase of Gatorade and the presence of alcohol at parties attended by team players, he now complained for the first time about the personal and sexual nature of Dorrance's comments and questions during practice and during the player interviews. Craig Jennings specifically complained:

> Coach Dorrance has in every player/coach review (except the one last week) and at the practice field asked the following questions:

1.   Who is your boy friend? Are you seeing anyone? What does he do? Are you enjoying the UNC campus? We personally do not find these questions totally offensive, but the answers are Melissa's to give, if she chooses without retribution.

2.   When answering yes to a boy friend or after bringing friends to team activities he then has asked the following: Are you sleeping with him? Are you shacking up with him? We find both of these questions totally inappropriate and harassing!

3.   The Monday practice session team question has been on numerous occasions: Who is shacking up with whom? He will even question roommates on the field about the exploits of their teammates?

4.   To one team member (not Melissa), he asks the team who her S___ for the week is/was? Like most of the team members she can not respond because he totally owns her way through your fine institution and controls her ability to go to your school. This is the sickest form of harassment.

(J.A. 1551.)

Ehringhaus forwarded Craig Jennings' May 12 letter to UNC Athletic Director Richard Baddour, who then ordered Beth Miller, the Senior Associate Athletic Director, to begin an investigation pursuant to UNC's sexual harassment policy. (J.A. 200, 264.) Miller arranged a meeting on May 26, 1998, at which Jennings, Craig Jennings, Ehringhaus, Baddour, Dorrance, and Miller herself attended. (J.A. 1529.) At the meeting, Jennings discussed the manner in which Dorrance had dismissed her from the team (J.A. 1401), recounted when Dorrance asked her about her sex life in their one-on-one evaluation meeting in December 1996 (J.A. 1404), and described the content of the sexual banter between Dorrance and his players. (J.A. 1406.) Dorrance responded with a firm denial of ever discussing sexual activity in a one-on-one meeting with any player, but he acknowledged that he participated in group discussions during practice that touched on his

players' sex lives. He maintained that his comments were only "of a jesting or teasing nature." (J.A. 1531.)

Following the meeting, Athletic Director Baddour wrote Craig Jennings a letter dated June 9, 1998, in which he stated:

> Any unwelcome discussions, including jesting, regarding sexual activity and team members' relationships with men are inappropriate in the context you described. While Coach Dorrance strongly denies that he has ever discussed an individual team member's sexual activity in a one-on-one discussion, Coach Dorrance has acknowledged that he participated in group discussions of a jesting or teasing nature with soccer team members. This is altogether inappropriate. While his actions were not intended to be offensive, he now realizes that his involvement in such discussions is inappropriate, and he will immediately discontinue that activity. Appropriate interventions have also occurred with Coach Dorrance to address these unacceptable conversations.

> The University and Coach Dorrance apologize for the "money issue." He has maintained that he did not intend to embarrass Melissa in any way. He recognizes that he offended her and used poor judgment and for that he apologizes.

> Coach Dorrance also realizes that his dismissal of Melissa was ill-timed, and he apologizes for the untimely discussion during the exam period.

(J.A. 1531.) Dorrance also signed the letter. (J.A. 1531.)

Athletic Director Baddour completed his investigation of Jennings' complaints by reprimanding Dorrance in a letter dated June 10, 1998, which stated:

> As I indicated to you in our last meeting I am writing to officially notify you that it is inappropriate for you to have

conversations with members of your team (individually or in any size group) regarding their sexual activity. Please refer to my letter of June 9, 1998 to Craig Jennings.

(J.A. 1533.)

B

On August 25, 1998, at the beginning of Jennings' third year at UNC and a few months after she was cut from the team, Jennings sued UNC and several individual defendants, including Dorrance, alleging (1) a Title IX claim against UNC, (2) claims under 42 U.S.C. § 1983 against Dorrance for sexual harassment and invasion of privacy and against various UNC officials for failure to supervise Dorrance, and (3) a common law claim against Dorrance for invasion of privacy. The district court granted the defendants' motions for summary judgment, and a divided panel of this court affirmed. *Jennings v. Univ. of N.C.*, 444 F.3d 255 (4th Cir. 2006). A majority of this court's active members voted to grant Jennings' motion to rehear this case en banc.

II

Relying indiscriminately on the catalogue of statements made by Coach Dorrance and various members of UNC's soccer team, made both before and after Jennings attended UNC, the majority concludes that they created a severe and pervasive sexually hostile environment that denied Jennings access to the opportunities and benefits of the soccer program. The majority's approach lacks any precision about the meaning of comments, their connection with Jennings, their timing (some occurred before Jennings came to UNC), and their effect on Jennings and the soccer program. A disciplined analysis of the facts and their effect on Jennings can lead only to the conclusion that the sexual banter, while extensive and inappropriate, did not deny Jennings any educational opportunity. Indeed, she has never claimed that it did. The majority's analysis amounts in essence to an evaluation of the vulgar language by Coach Dorrance and teammates rather than an analysis of whether such violations of civility amount to a cause of action under Title IX.

While I agree that the sexual banter during soccer practices was vulgar and inappropriate, both as to Coach Dorrance and the soccer team members, the banter had no effect on whether Jennings played soccer, or indeed whether she wanted to play soccer, at UNC. To the contrary, despite the banter, Jennings deeply desired to be a member of the team. When she was cut for reasons unrelated to sexual banter, she was shocked and profoundly disappointed.

At bottom, Jennings made genuine complaints about vulgar sexual banter, but there were no complaints that the sexual banter denied her educational benefits. Therefore Jennings did not make out a Title IX claim.

Before conducting the analysis demanded by Title IX, a review of the statute's requirements is necessary. This is particularly so because the majority has misdescribed the requirements of a Title IX claim, omitting the core requirement that the plaintiff demonstrate that she was denied the benefits of an educational program or activity on the basis of sex. *See* ante at 9.

Title IX prohibits an educational institution that receives federal funds from engaging in sex-based discrimination. The statute provides, with certain exceptions not at issue here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). While Title IX does not, by its terms, create a private cause of action against the funding recipient, the Supreme Court has implied one, *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979), and it has held that money damages are available in such suits, *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 76 (1992). The damages remedy will lie against the funding recipient, however, only when "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [funding] recipient's behalf has actual knowledge of discrimination in the recipient's programs" and responds with "deliberate indifference to the discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

As with Title VII, "sexual harassment" under Title IX is a form of "discrimination." *See Franklin*, 503 U.S. at 74-75. In the context of

student-on-student harassment, the Court has held that the harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999). But other than for student-on-student harassment, the Court has not defined the substantive contours of the harassment forbidden by Title IX. Nonetheless, courts of appeals have looked to the Supreme Court's Title VII jurisprudence when interpreting Title IX. *See, e.g.*, *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65-66 (1st Cir. 2002); *Lam v. Curators of the Univ. of Mo.*, 122 F.3d 654, 656-57 (8th Cir. 1997).

Because the Supreme Court implied in *Davis* that the "severe, pervasive, and objectively offensive" standard for student-on-student harassment was more demanding than Title VII's "severe or pervasive" standard for harassment generally, I agree with the majority that the level of harassment required for actionable claims under Title IX in the case of teacher-on-student harassment is Title VII's "severe or pervasive" standard. *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). This standard, of course, must be applied with sufficient discipline that the standard does not become a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Much more significant to Title IX liability, however, is the analysis required for determining when a given level of harassment brings about *consequences* with which Title IX is concerned. To succeed in a Title IX harassment claim, the plaintiff must prove that the harassment was so severe or pervasive "that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. This requirement of specified consequences derives from the text of Title IX itself, which shields students from "discrimination," such as being "excluded from participation in" or "denied the benefits of" any "education program or activity receiving Federal financial assistance" on the basis of sex. 20 U.S.C. § 1681(a). Therefore, harassment standing alone, no matter how severe or pervasive, is not actionable; it must have the *effect* of discriminating so that it effectively denies students of "equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651; *see also* 20 U.S.C. § 1681(a). Title IX's purpose is not to eradi-

cate harassment from the educational environment; it is "a specific federal statute designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner." *Gebser*, 524 U.S. at 292.

Thus, Jennings must show that she was subjected to harassment — because of her sex — so objectively severe or pervasive that she was effectively denied equal access to UNC's resources and opportunities.

III

In this case, Jennings' evidence, while amply describing instances of sexual banter among teammates and Coach Dorrance, falls far short of demonstrating that Jennings was denied the benefits of soccer team membership. She has never alleged that she did not want to be a member of the team or that the banter denied her the benefits of membership. Indeed, she wanted to remain on the team and believed that her improvements in performance justified remaining on the team. She was shocked and angered when she was cut.

Moreover, Jennings complained only once to UNC officials during her two years on the team about the banter and then at such a low level that the person to whom she complained did not recall it. In addition, when Jennings' father wrote on Jennings' behalf about problems that Jennings had encountered with the soccer program — a lack of reimbursement and invitations to parties at which alcohol was served — he did not mention any sexual banter or harassment. Only after Jennings was cut from the team were accusations of sexual harassment made.

Jennings has tried to argue that she was denied an educational benefit by asserting conclusorily and without factual support that Dorrance's conduct "negatively impacted [her] academic performance and performance on the soccer field." (J.A. 1585.) Yet, the record shows that when, over the course of two years, she was confronted with her poor academic and field performance, her response never suggested a problem with Dorrance's conduct. Rather, the discussions focused on more disciplined training and more time for academics. Moreover, the record shows that Jennings did improve academically each semester. (J.A. 1449.) More revealing is Jennings' own evalua-

tion of herself that she was doing better. As she testified, when she was cut, she was expecting Dorrance to say to her, "You know, you've improved." (J.A. 1388.)

It is not surprising therefore that Jennings' argument on appeal focuses entirely on whether Dorrance's conduct was severe or pervasive, rather than on whether she was denied an educational benefit. The majority simply continues this emphasis by ignoring or misstating the core requirement of Title IX liability that conduct deprive a plaintiff of "equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651; *see also* 20 U.S.C. § 1681(a). The majority completely and inexplicably omits this core requirement from its boilerplate recitation of the necessary elements for "establish[ing] a Title IX claim on the basis of sexual harassment." *See ante* at 9.

When the majority does purport to address the omitted requirement, it holds that Jennings may satisfy the requirement by merely alleging that Dorrance's comments had a "negative impact" on her "performance on the soccer field." *See ante* at 17. This holding stands on a complete misreading of *Davis*. If the majority sincerely believes that the Supreme Court "point[ed] out that sexual harassment reaches the level of actionable discrimination when it has 'a concrete, negative effect on [the victim's] ability' to participate in a program or activity," *see ante* at 15 (quoting *Davis*, 526 U.S. at 654), it has blatantly ignored the entire portions of the opinion that actually define the cause of action. Contrary to the majority's representation of *Davis*, the Supreme Court reiterated *five* separate times that Title IX's discrimination requirement is satisfied "*only where* [the harassment is so severe or pervasive] that it can be said to *deprive the victims of access* to the educational opportunities or benefits provided by the school." *See Davis*, 526 U.S. at 654 (emphasis added); *id.* at 633 (same); *id.* at 651 (same); *id.* at 652 (same); *id.* at 653 (same). It was only when the Court applied "*this standard* to the facts at issue" that it stated the following: "The harassment was not only verbal; it included numerous acts of objectively offensive touching, [including] criminal sexual misconduct. . . . Further, *petitioner contends* that the harassment had a concrete, negative effect on her daughter's ability to receive an education." *Id.* at 653-54. It is almost too obvious to state, but the petitioner's isolated contention in *Davis* did not define

what it means to "discriminate" under Title IX, as the majority apparently believes.[4] The Court accepted that allegation as part of a complaint that included allegations of "objectively offensive touching" of the plaintiff amounting to "criminal sexual misconduct." The majority's importation of and heavy reliance upon a watered-down "negative impact" test, derived from a single allegation in the *Davis* petitioner's complaint, is obviously wrong, particularly when the Court specifically and repeatedly articulated the Title IX cause of action.

The majority's gutting of the "denial of benefit" requirement is not only contrary to the Supreme Court's pronouncements in *Davis*, but more importantly, it contravenes the actual text of the statute, which only shields students from "*discrimination*," such as being "*excluded* from participation in" or "*denied* the benefits of" any "education program or activity." *See* 20 U.S.C. § 1681(a) (emphasis added).

The acts of sexual harassment alleged by Jennings can be divided, for discussion purposes, into three categories: (1) "sexual" banter at practice *directed at or involving Jennings*; (2) other sexual banter at practice among teammates and Coach Dorrance; and (3) the December 1996 evaluation meeting between Jennings and Dorrance at which Dorrance inquired, as part of his effort to discover the cause of Jennings' poor grades, who Jennings was "f**king." I address these in turn.

A

Jennings identified two incidents during her two years on the team when the banter at practices involved or implicated her.

The first incident arose prior to a practice when one of Jennings' teammates recounted her weekend's activities with her boyfriend, and Dorrance asked if it had been a "shag fest." (J.A. 1249.) The team-

---

[4]Indeed, the majority even waters down the petitioner's allegation in *Davis*. In *Davis*, the petitioner contended that the harassment had a "concrete, negative effect on her daughter's ability *to receive an education*." *Davis*, 526 U.S. at 654. The majority converts "receive an education" to "participate in a program or activity." *Ante* at 15.

mate, seeking to involve Jennings in the conversation and knowing that Jennings had visited her boyfriend at a different university the previous weekend, asked, "What about Trim'n?" (J.A. 1246-48, 1252.) Dorrance "chimed in," saying, "yes, what about Trim'n?" (J.A. 1246, 1252.) Jennings ignored these questions from her teammate and Dorrance and left for the practice field. (J.A. 1255.)

Dorrance's question was an offhand comment amounting to "simple teasing." It was Jennings' teammate who instigated the efforts to involve Jennings in the conversation, and Dorrance's question was merely a follow-up to hers. The only reason the question even achieves the status of "simple teasing," instead of being utterly innocuous, is because of Dorrance's earlier "shag fest" comment to Jennings' teammate. A "recurring point" in the Supreme Court's Title VII opinions, however, is that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citation omitted). The Court's "standards for judging hostility are sufficiently demanding" to "filter out complaints attacking the ordinary tribulations" of collegiate athletics, "such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (citation and quotation marks omitted). This incident certainly falls within the "simple-teasing" category.

The second incident involved a teammate asking Jennings whether a boy she had seen Jennings hug was a boyfriend or just a friend. (J.A. 1257-59.) Jennings responded that the boy was just a friend. (J.A. 1258.) As for Dorrance's involvement, Jennings remembers him being present but saying nothing. (J.A. 1258.) Not even the majority relies on this incident, for reasons that are obvious — it could neither stand alone as an incident of sexual harassment nor add to a collection of incidents constituting sexual harassment.

B

The sexual banter at practices among teammates and Coach Dorrance also does not rise to sexual harassment of Jennings. Jennings rightfully places herself as a bystander during this banter. When there is an absence of sexual harassment *directed at a plaintiff*, however,

environmental conduct voluntarily engaged in by others has never supported a claim for sexual harassment.

In the two cases where we have most relied on background conduct in applying the "severe or pervasive" standard, the *direct* harassment of the plaintiff still provided the foundation for the hostile environment claim. In *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001) (*Spriggs II*), we took into account environmental conduct as enhancing conduct specifically directed at the plaintiff. But the core of the harassment claim in *Spriggs* was based on a white supervisor repeatedly calling his African-American subordinate, "dumb monkey" and "nigger," during the relevant employment period. *See Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1017 n.2 (4th Cir. 1999) (*Spriggs I*). Similarly, in *Ocheltree v. Scollon Prod. Inc.*, 335 F.3d 325 (4th Cir. 2003) (en banc), we took environmental conduct into account, but primarily to enhance the core sexual harassment directed at the plaintiff, who was a female. The targeted harassment included male co-workers confronting the plaintiff with a pornographic picture depicting pierced male genitalia; simulating oral sex on a mannequin while fondling the mannequin's breasts in front of the plaintiff in order to rile and offend her; and singing to the plaintiff, in an operatic voice, "Come to me, oh, baby come to me, your breath smells like come to me." *Id.* at 328.

In cases where there was a scarcity of direct harassment, however, the plaintiffs could not rely on environmental conduct to make their claim. *See, e.g.*, *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (upholding entry of summary judgment against complainant because of his overreliance on incidents "not directed specifically at him," such as those occurring in "group settings").

Moreover, the Supreme Court itself has assumed throughout its Title VII and Title IX cases that only harassment *directed* and *targeted* at the victim was capable of creating a hostile environment. In *Meritor*, for example, "sexual harassment" was defined as "unwelcome sexual *advances*, *requests* for sexual favors, and other verbal or physical conduct of a sexual nature." 477 U.S. at 65 (citation and quotation marks omitted) (emphasis added). In *Harris*, the Court stated that the workplace must be "permeated with discriminatory intimidation, ridicule, and insult." 510 U.S. at 21 (citation and quotation

marks omitted). But the intimidation, ridicule, and insults in *Harris*, as elsewhere, *targeted the victim*. 510 U.S. at 19 (stating the victim was made "the target of unwanted sexual innuendos"). Thus, in *Davis*, the student was not only verbally assaulted, but was also touched in a manner that amounted to "criminal sexual misconduct." 526 U.S. at 653. In *Faragher*, the complainant faced "uninvited and offensive touching" and such choices as, "[d]ate me or clean the toilets for a year." 524 U.S. at 780. In *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 77 (1998), the complainant "was forcibly subjected to sex-related, humiliating actions against him," such as being "physically assaulted . . . in a sexual manner" and being "threatened with rape." These examples fairly reflect the Court's consistent teaching that Title VII and Title IX protect victims, not witnesses, of harassment.

In short, the indirect sexual banter of which Jennings complains cannot on its own support Jennings' harassment claim. Nor does it heighten the discriminatory impact of the one instance of simple teasing directed at her so as to satisfy the demanding requirement that the harassment be so "severe or pervasive" that it "effectively bar[ ] the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.

C

The third and perhaps principal incident of which Jennings complains occurred during Jennings' end-of-year personal progress meeting in December 1996. It arose from Dorrance's inquiry into the causes for Jennings' poor academic performance during her first semester at UNC. Jennings' GPA at the time was 1.538 on a 4.0 scale. (J.A. 1449.) During the meeting, Dorrance impressed upon her the importance of her studies, telling her that she "ha[d] to study" and "do better in school." (J.A. 1316.) He then sought to find the causes of Jennings' poor academic performance, as a responsible coach who risked losing a player due to academic ineligibility would do. Dorrance asked Jennings if she needed help, if she had been visiting the team's academic tutor (which she had been). (J.A. 1318.) He then wondered whether Jennings' social life was affecting her grades, asking, according to Jennings' testimony, "What is going on in [your] social life? Is that affecting [your] grades?" (J.A. 1329-30.) "Who are

you f**king?" "[I]s that affecting your grades?" "[Is that] causing a problem with your grades, with your performance?" (J.A. 1326, 1330.) Jennings forcefully replied that her personal social life was "[n]one of his god damn business." (J.A. 1325-26, 1331.) Dorrance immediately dropped the subject, and according to Jennings, "started talking about my performance as a player." (J.A. 1327.)

As phrased, Dorrance's question "Who are you f**king" was plainly vulgar and certainly too personal. Nonetheless, the inquiry clearly did not focus on sex or include an overture to sex; it was, in context, obviously an inquiry about what was occupying Jennings' time. Jennings bordered on the verge of becoming academically ineligible to play soccer, and Dorrance, as her coach, intervened, asking if her grades were being adversely affected by her social life. Dorrance's question about Jennings' sex life was not physically threatening; it was not a sexual proposition; it was not made in an attempt to humiliate, degrade, and demean. *See Harris*, 510 U.S. at 23 (differentiating between the "physically threatening or humiliating" comment and the "mere offensive utterance"). Rather, the question was asked in an effort to discover the cause of Jennings' poor academic performance. Dorrance's use of profanity and his inquiry into a personal subject for purposes of a legitimate inquiry about Jennings' time does not transform the single, isolated question into a "severe" example of sexual harassment. The context and purpose of the question, indeed, removed it from any consideration as sexual harassment of the kind prohibited by Title IX. *See Harris*, 510 U.S. at 21 ("'[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII" (quoting *Meritor*, 477 U.S. at 67)).

*       *       *

Jennings cites no other incidents to support her claim, and she testified at the end of her deposition that this was all that she knew. (J.A. 1430-31.) She only became aware of other evidence — evidence upon which the majority relies heavily — after the commencement of this action. We are thus left with one simple incident of teasing, the team's sexual banter which Jennings overheard, and one coarsely posed question about what time-consuming distraction might be affecting Jennings' grades.

To evaluate such evidence for liability, courts must determine whether an environment is sufficiently hostile or abusive "by looking at all the circumstances," *Harris*, 510 U.S. at 23, including the context of the case, which in this case is the collegiate athletic field. *See Oncale*, 523 U.S. at 81 (explaining that a football player's environment "is not severely or pervasively abusive . . . if the coach smacks him on the buttocks as he heads onto the field —- even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office"). The collegiate athletic field is unlike the typical classroom, and the collegiate athletic coach is unlike the typical university instructor. The proper baseline by which to judge the language of Coach Dorrance and Jennings' teammates is the world of competitive collegiate athletics in which coaches, by necessity, have a much more casual and personal relationship with their student-athletes. While vulgarity of the level witnessed by Jennings was surely not necessary to the program, it is undoubtedly normal for a coach to have discussions with a player about his or her body, athletic performance, academic performance, inter-player relationships, social activities, and extracurricular activities. College sports, especially an elite program like women's soccer at UNC, involve long and intensive daily practice sessions, extensive overnight travel, and a significant amount of downtime spent together.

Some coaches use profanity or sarcasm as a way to express displeasure, to emphasize a point, or to motivate. Dorrance, according to Jennings, cursed when his players made mistakes, such as when a player made a poor pass. (J.A. 1231.) But Title IX does not protect students from profanity. *See McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir. 1996) (holding that Title VII does not protect employees from discrimination "'because of' [the harasser's] vulgarity and insensitivity and meanness of spirit").

The critical inquiry in this case, as in all Title IX cases, is whether the alleged harassment was so objectively "severe [or] pervasive . . . that it can be said to deprive [Jennings] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. The majority's application of a simple "negative impact" test — whether Dorrance's comments had a "negative impact" on Jennings' "performance on the soccer field," *ante* at 17 — is simply inconsistent with the governing statute and with Supreme Court precedent, both

of which require that the harassment actually "discriminate" by "de-priv[ing] the [plaintiff] of access to . . . educational opportunities or benefits." *See* 20 U.S.C. § 1681(a); *Davis*, 526 U.S. at 650.

On this record, it cannot be said that Dorrance's language effectively excluded Jennings from participating as a member of UNC's women's soccer team, especially in light of Jennings' own testimony. And her empty assertion, made conclusorily in a litigation affidavit, that Dorrance's conduct "negatively impacted" her performance is completely undermined by her own testimony of the events. When Dorrance cut her from the team, Jennings testified that she was *shocked* and *hysterically upset* at being cut because she thought she had been *improving* as a player. She thought she had done well, doing everything she could to become a better player under Dorrance's direction. In Jennings' own words, "I was not expecting to get cut. I was expecting [Dorrance] to say, 'You know, you've improved,' this and this. I thought I had done well. . . . I was, you know, making every possible attempt to do what he had asked." (J.A. 1388.) This testimony hardly depicts a player who has been sexually harassed to the point of being denied the educational opportunity of playing on the team. The majority's effort to depict the environment on the soccer team as one that denied Jennings (or any other player, for that matter) the benefits of playing soccer is belied by this testimony.

Furthermore, Jennings' grade point average progressively improved during her two seasons on the team. Her cumulative GPA at the end of her freshman year was 1.539, at the end of the 1997 summer sessions it was 1.903, at the end of the fall 1997 semester it was 1.964, and at the end of the 1998 spring semester, when she was cut from the team, it was 2.022. (J.A. 1449.) If a decline in grades is evidence of discriminatory impact, then an improvement in grades should be evidence otherwise. *Cf. Davis*, 526 U.S. at 652 (stating that even "a mere decline in grades" is insufficient to prove that the alleged harassment has deprived a student of access to school resources). A player, who not only does not leave a team or school, but also has a willingness or indeed a growing desire to remain with the team or school, must surely have to make an extraordinary showing to sustain a Title IX claim.

The majority fails to confront the legal consequences that flow from the undisputed fact that Jennings' evidence consists of (1) only

*two* direct verbal comments made over the course of *two* years, and (2) second-hand comments that neither paint women in a negative or demeaning light, nor constitute anything approaching sexual advances, threats, coercion, or intimidation. In the face of her teammates' graphic, detailed, and open descriptions of their sexual exploits, Jennings complains of Dorrance going too far in his teasing. But however this environmental language is characterized, it falls woefully short of elevating the two verbal comments directed at Jennings to a level at which one could conclude that Jennings was denied the benefits of playing soccer for UNC. As Jennings' own testimony provides, it was her substandard conditioning, performance, and grades that did that.

IV

Jennings' Title IX claim must fail for another, independent reason. Dorrance's comments were not gender-based, in that they were not made because Jennings was a woman. Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). A person "is harassed or otherwise discriminated against ['on the basis of'] his or her sex if, 'but for' the employee's sex, he or she would not have been the victim of the discrimination." *Wrightson v. Pizza Hut*, 99 F.3d 138, 142 (4th Cir. 1996). "The critical issue" is "whether members of one sex are exposed to disadvantageous terms or conditions . . . to which members of the other sex are not exposed." *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring).

The direct harassment of which Jennings complains was in no way related to her gender. Dorrance asked, "What about Trim'n?", not because Jennings is a woman, but because he and a teammate wished to engage Jennings in a conversation about her dating life. Her gender was irrelevant to the question. Even more plainly, Dorrance did not ask Jennings about her sex life in December 1996 because of her gender, but because he was trying to discover the cause of Jennings' substandard academic performance. Jennings' gender played no role in Dorrance's question.

Furthermore, there is no evidence on the record from which to infer that "but for" Jennings' gender, Dorrance would have refrained from teasing Jennings about her dating life and from asking whether her

sex life was affecting her grades. An integral attribute of Dorrance's coaching style was his willingness to engage his players on a personal and frank level. If Dorrance was then the coach of the men's soccer team, he would just as surely have teased his male players about their weekends with their girlfriends as he lightly teased Jennings about her weekend with her boyfriend. Such teasing about a player's social life is the norm on any collegiate athletic team, whether male or female. Indeed, Jennings had the opportunity to present evidence that Dorrance treated women differently than men, as Dorrance simultaneously coached both the men's and women's soccer teams at UNC from 1979 to 1988. But the record remains silent about any such difference.

In addition, there is no evidence that Dorrance's inquiry about Jennings' social life was gender-based. Responsible coaches, whether of a men's or women's athletic team, search for the cause of a player's borderline academic ineligibility, including whether the player's social life is interfering. While Dorrance posed his question too crassly and personally, the question nonetheless was a grade-centered inquiry and not an inquiry made because Jennings was a woman. There is no evidence on the record that "but for" Jennings' gender, Dorrance would not have teased about her weekend or asked whether her sex life was affecting her grades.

As for the second-hand sexual banter, its relevance becomes yet more remote when considering whether Jennings was exposed to the banter because of her gender. There is no evidence that distinguished her environment from a male environment, where players would undoubtedly hear the same banter. She was exposed because she was a member of the team, not because she was a woman. At the beginning of oral argument, Jennings' counsel conceded that there would be no case if every fact were the same except that the team was full of male players "because [in that hypothetical] it would not be gender based." This concession is fatal because it necessarily relied on a further concession — that the evidence, standing alone, could not show that Jennings was discriminated against because of her sex.

Moreover, it would be ridiculous to infer that Dorrance's comments were motivated by general hostility toward the presence of women on a women's soccer team, when he was the coach of the

team. *See Oncale*, 523 U.S. at 80 (stating that when the harassing conduct is not motivated by sexual desire, an inference of gender-motivated harassment may still be derived if a victim "is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women [or men] in the [educational setting]"). Indeed, Dorrance has been the head coach of the women's team for 27 years (since 1979), leading his players to 19 national championship titles. This duration and success rate makes any inference that Dorrance is generally hostile to young women soccer players even more preposterous.

"Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimination* [on the basis of sex].'" *Oncale*, 523 U.S. at 81. The evidentiary route that Jennings has chosen, for the reasons given, does not prove discrimination "on the basis of sex." *See* 20 U.S.C. § 1681(a).

V

Jennings seeks to hold Dorrance and Ehringhaus personally liable for sexual harassment under 42 U.S.C. § 1983, basing her claim on her Fourteenth Amendment equal protection right to be free from sexual harassment in educational settings. The Equal Protection Clause

> confers a right to be free from gender discrimination that is not substantially related to important governmental objectives. Applying this precept, courts have held that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983. Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983.

*Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (citations and quotation marks omitted).

Because Jennings has failed to demonstrate that Dorrance's language was so severe or pervasive as to deny her the opportunity to play soccer for UNC, it follows that her § 1983 claim must also fail.

## VI

Participation in intercollegiate athletics involves, of necessity, a level of physical and mental training that toughens a player in competition. It is not the same type of training that attends participation in a chamber orchestra or a debate team. Driving players to reach beyond their physical limits often involves yelling, encouragement, and condemnation. We can hardly apply the standards of the classroom or the courtroom to the language of the athletic field.

Of course, the environment cannot provide a cover for discrimination, including sexual harassment. In disposing of a case as this, we must discern the difference without imposing a civility code.

In the context of this case, Title IX presents the narrow issue of whether a player — in this case Jennings — was denied the benefits of the soccer team because of Coach Dorrance's comments. It is crystal clear that she did not think so until after she was cut from the team. From her anger and disappointment in being cut — concededly not because of sexual discrimination — she pursues this unfortunate lawsuit to complain about vulgar language that surely did offend her, and rightfully so. But Title IX requires more.

For these reasons, I would affirm the judgment of the district court.

Judge Williams has authorized me to indicate that she joins in this opinion.